## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

**ROBERT WALTERS**

        **Plaintiff,**

    **v.**

**CITY OF BYRAM**

        **Defendant.**

**CIVIL NO.**  3:23-cv-79-KHJ-MTP

## COMPLAINT

Plaintiff Robert Walters asserts his causes of action against defendant City of Byram as follows:

### THE PARTIES

1.      Plaintiff is Robert Walters.  He is 43 years old.  He lives and is domiciled in Rankin County, Mississippi.  He is a Mississippi citizen.

2.      Defendant is City of Byram (hereinafter "**Byram**").  Byram is an incorporated city, municipality, and political subdivision of the state of Mississippi.  *See, e.g.*, Miss. Code Ann. § 17-1-1 ("Municipality means any incorporated city . . . within the state"); Miss. Code Ann. § 11-46-1(i) ("'Political subdivision' means any . . . municipality").  Byram is located within Hinds County.  The chief executive officer of Byram is its Mayor, currently Richard White.  The legislative body of Byram is its Board of Alderman.  Together, Byram's Mayor and Board of Alderman constitute Byram's "governing authorities."  *See, e.g.*, Op. Att'y Gen., 1990 WL 547751 (Miss. A.G. 1990) ("Together the mayor and board of aldermen constitute the 'governing authorities'").

1

Byram can be sued in its own name. Miss. Code Ann. § 11-45-25 ("A municipality may sue and be sued by its corporate name).

## JURISDICTION AND VENUE

3.      The Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question) and 42 U.S.C. § 2000e-2 *et seq.* (Title VII), as more particularly set-out herein.

4.      The Court has supplemental, subject-matter jurisdiction over Mr. Walters's state law claims pursuant to 28 U.S.C. § 1367(a) because the state-law claims are so related to his federal law claims that they form part of the same case or controversy, as more particularly set-out herein.

5.      The Court has personal jurisdiction over City of Byram because it is an incorporated city, municipality, and political subdivision of the state of Mississippi, and is therefore a Mississippi citizen.

6.      Venue for Mr. Walters's Title VII claims is proper in this Court pursuant to 42 U.S.C. § 2000e–5(f)(3) because (1) the unlawful employment practice alleged herein was committed within this judicial forum (specifically, Hinds County), (2) upon information and belief the employment records relevant to this action are found in this judicial district (same), and (3) but for the unlawful employment practice, Mr. Walters's would have been employed in this district (same).

7.      Venue for Mr. Walters's supplemental state-law claims is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because the City of Byram is susceptible to this Court's personal jurisdiction in this forum.

8.    Alternatively, venue for Mr. Walters's supplemental state-law claims is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because the City of Byram's unlawful acts giving rise to this lawsuit, as well as Mr. Walters's resulting injuries and damages, occurred within this judicial district (specifically, Hinds County) and, accordingly, a substantial part of the events or omissions giving rise to the claims asserted in this lawsuit occurred in this judicial district.

## PROCEDURAL AND STATUTORY REQUIREMENTS

9.    Byram employed at least 15 employees every week of the year in both 2020 and 2021.

10.    Byram employed at least 101 employees every week of the year in both 2020 and 2021.

11.    Byram hired Mr. Walters as a fire fighter assigned to the City of Byram Fire Department around August 20, 2021.

12.    Byram continuously employed Mr. Walters until it terminated his employment around November 3, 2021.

13.    On February 18, 2022, within 180 days of his unlawful termination, Mr. Walters through his attorney timely filed an EEOC Charge of Discrimination with the EEOC Jackson Area Office alleging City of Byram unlawfully terminated Mr. Walters's employment because of his religion in violation of Title VII (EEOC Charge No. 423-2022-00679). On February 23, 2022, Mr. Walters through his attorney timely amended his EEOC Charge of Discrimination to clarify a date alleged in his original Charge.

14.    On November 4, 2022, the United States Department of Justice, Civil Rights Division, issued Mr. Walters a Notice of Right to Sue in this matter.

15.    Mr. Walters timely filed this federal lawsuit within 90 days of receiving the DOJ's Notice of Right to Sue letter.

**FACTS**

**A.    The Plaintiff – Mr. Robert Walters**

16.    Robert Walters is a lifelong fire fighter.  He lives with his wife and children in Rankin County, Mississippi.  His family depends on Mr. Walters's wages to support themselves.

17.    Mr. Roberts is a Christian and adheres to what he describes as a Christian worldview.

**B.    The Defendant – the City of Byram and its Fire Department**

18.    The City of Byram is an incorporated city in Hinds County, Mississippi.

19.    Byram operates pursuant to a code-charter system of local government.

20.    Byram's chief executive is its Mayor.

21.    Richard White is Byram's current Mayor and was Mayor for the entirety of Mr. Walters's employment with Byram.

22.    Byram's legislative body is its Board of Alderman.

23.    The Mayor exercises superintending control of the city's departments and employees.

24.    The Board of Alderman have final authority to terminate Byram employees.

25.    Procedurally, to the best of plaintiff's understanding, the Board of Alderman

exercises this authority by voting on a resolution to terminate an employee.

26.    To the best of plaintiff's understanding, the Mayor then must exercise his authority to approve or veto that termination resolution.

27.    Byram maintains a fire department called the "Byram Fire Department" or "BFD."

28.    The chief executive of the fire department is its Fire Chief.

29.    Fred Green is the Fire Chief who hired Mr. Walters, promulgated the fire department's COVID-19 vaccination policy (described further below), refused to reasonably accommodate Mr. Walters' religious objection to that policy, and recommended Mr. Walters be terminated.

## C.    Chief Green's Response to COVID-19 Prior to the Availability of Vaccinations

30.    The respiratory disease known as COVID-19 is caused by the Severe Acute Respiratory Syndrome Coronavirus 2 ("SARS-CoV-2") and its many variants.

31.    The U.S. Centers for Disease Control ("CDC") reported the first laboratory-confirmed case of COVID-19 in the United States on January 20, 2020.

32.    By the week of August 12, 2020, the CDC reported a total of slightly more than 5 million confirmed cases of COVID-19 nationwide.

33.    During this time, before any COVID-19 vaccine became available, the Byram fire department continued to operate normally and successfully performed all of its fire and rescue duties.

34.    Before the availability of any vaccination against the SARS-CoV-2 virus, Chief Green implemented workplace precautions that were apparently safe enough to allow

Byram's fire fighters to continue coming to work, fighting fires, and performing emergency medical services without unreasonable risk of infection to themselves or the public.

35.    Those precautions were (1) wearing a face covering and (2) performing temperature self-checks every day.

**D.    Chief Green's Response to COVID-19 After the Availability of Vaccinations**

36.    Around December 11, 2020, the U.S. Food and Drug Administration issued an Emergency Use Authorization for the first publicly available COVID-19 vaccination in the United States manufactured by Pfizer, Inc.

37.    The CDC reports that as of June 1, 2021 the COVID-19 "B.1.617.2 / 'Delta' variant" had become the "dominant variant in the U.S."[1]

38.    The CDC reports that as of July 30, 2021, "The early data showing high viral loads in people infected with the Delta variant of COVID-19 suggest a concern that, unlike with other variants, vaccinated people infected with Delta can transmit the virus to others."[2]

39.    *The Lancet* medical journal reported on October 29, 2021 that "fully vaccinated individuals with breakthrough infections have peak viral load similar to unvaccinated cases and can efficiently transmit infection in household settings, including to fully vaccinated contacts."[3]

---

[1]  The CDC publishes a "COVID-19 Timeline" on its website which includes these facts.  The site may be accessed here: https://www.cdc.gov/museum/timeline/covid19.html

[2]  *Id.* at https://www.cdc.gov/museum/timeline/covid19.html

[3]  Anika Singanayagam, et al., *Community transmission and viral load kinetics of the SARS-CoV-2 delta (B.1.617.2) variant in vaccinated and unvaccinated individuals in the UK: a prospective, longitudinal, cohort study*, THE LANCET (Oct. 29, 2021).  A copy of the article may be accessed here: https://www.thelancet.com/journals/laninf/article/PIIS1473-

40.     Until, at the earliest, September 30, 2021, Chief Green did not require any of his fire fighters to receive any vaccination against the SARS-CoV-2 virus as a condition of their continued employment.

41.     During this entire period of time – nearly 18 months of the pandemic in the United States – the Byram fire department continued to operate normally and successfully performed all of its fire and rescue duties, and Chief Green only required fire fighters to wear face coverings and perform temperature self-checks.

42.     Likewise, during this time and continuing until the present day, no other Byram department required any of its employees to receive any COVID-19 vaccination.

43.     Around August 23, 2021, the FDA granted full approval to the first publicly available COVID-19 vaccination in the United States manufactured by Pfizer.

44.     Around that same time, Chief Green promulgated a new rule that required all Byram fire fighters to receive any of the then-available COVID-19 vaccinations no later than September 30, 2021 unless the employee received an exemption based on religious objection.

45.     Under Chief Green's rule, an employee who did not receive any COVID-19 vaccination or religious-based exemption by September 30, 2021 would be terminated for non-compliance with the rule.

46.     Chief Green's rule was unique within Byram city government.  No other Byram department, including the Byram Police Department, required any of its employees

---

3099(21)00648-4/fulltext

to receive any COVID-19 vaccination.

**E.    Chief Green Recruits Robert Walters for Employment**

47.    Mr. Walters is a veteran fire fighter.

48.    In 2021, he was already employed as a full-time fire fighter at the Jackson-Medgar Wiley Evers International Airport.  Mr. Walters was earning greater wages as an airport-based firefighter than what he would have earned working for Byram. Nevertheless, Byram was closer to Mr. Walters's home and church community.

49.    Chief Green recruited Mr. Walters to leave his current firefighting employment and begin employment with the Byram Fire Department.

50.    Prior to accepting employment, Mr. Walters told Chief Green he had a religious-based objection to receiving any of the then-available COVID-19 vaccines, and asked whether the Byram fire department had or would have any COVID-19 vaccination rule.

51.    Chief Green indicated that the fire department might require fire fighters to receive any currently available COVID-19 vaccination, but Mr. Walters could apply for a religious-based exemption.

52.    Mr. Walters then asked if he would be required to weekly COVID-19 tests if he received a religious-based exemption.

53.    Chief Green indicated Mr. Walters would not have to weekly test.  Specifically, on August 17, 2021, Green wrote to Mr. Walters via text message: "Hay [sic] Robert we have not gotten anything in writing that says you have to be tested every week!!!"

54.    Based on these promises, Mr. Walters agreed to accept Chief Green's offer of

employment.

55.     Byram, through the decision or recommendation of Chief Green, hired Robert Walters as a full-time Byram fire fighter around August 20, 2021.

**F.     Chief Green Denies Mr. Walters any Reasonable Accommodation**

56.     On August 23, 2021, Mr. Walters submitted a formal request for exemption to the fire department's COVID-19 vaccination rule based upon his sincerely held religious objection.

57.     To the best of his knowledge, Mr. Walters was the only Byram fire fighter who formally requested a religious-based exemption from Chief Green's vaccination rule.

58.     As part of his request, Mr. Walters submitted a letter from his religious congregation, the First Pentecostal Church in Jackson.  The letter indicated that the congregation "fully support[s] the closely held religious convictions of . . . . those who . . . conclude that it would violate their personal religious convictions to receive the COVID-19 vaccine."

59.     Relevant to this lawsuit, Mr. Walters adheres to a religious worldview that good and evil exist; that he is religiously obligated to do good and is religiously prohibited from doing or submitting to evil; and the then-currently available COVID-19 vaccines, along with any government compulsion to receive such a vaccine, were spiritually evil.  Accordingly, Mr. Walters determined that he was religiously prohibited from receiving any of the available COVID-19 vaccines.

60.     Chief Green rejected Mr. Walters's request for exemption.

61.     On September 1, 2021, Chief Green held a meeting with Mr. Walters to discuss

the matter.

62.    Chief Green told Mr. Walters that he rejected Mr. Walters's request because, in the opinion of Chief Green, the Pentecostal Church did not believe that vaccination was spiritually prohibited.

63.    Chief Green told Mr. Walters that if he were a different religion, specifically a Jehovah's Witness, then Green would grant Mr. Walters's request for exemption.

64.    Chief Green also told Mr. Walters that he had spoken to Byram's city attorney, a man named John Scanlon, and Scanlon said Walters's religious objection "would not suffice" for an exemption.  Based on the context of the conversation, it was objectively obvious that Green meant Scanlon shared the view that Mr. Waters's request for exemption should be denied because the men did not regard Pentecostal faith to prohibit vaccinations and, therefore, unworthy of protection.

65.    Chief Green concluded the meeting with Mr. Walters by telling him, to the effect, "you have two choices – either take the vaccine or be terminated."

66.    Based on his tone, demeanor, and the context of the meeting, it was objectively obvious that Chief Green did not believe Mr. Walters's religious beliefs were worthy of protection, and Green, or Scanlon, or both, disdained Walters because of his particular religious beliefs regarding the vaccine.  In other words, it was obvious that Green, or Scanlon, or both, disdained Mr. Walters because they regarded his religious beliefs as "fringe," out of the mainstream, and unworthy of protection.

67.    Mr. Walters continued to press his request for religious accommodation, and he met with Chief Green again on September 17, 2021 to discuss the matter.

68.    During that meeting, and for the first time, Green told Walters that he would exempt him from the vaccination rule, but only if Mr. Walters agreed to receive a weekly COVID-19 test, at his own expense, and from a medical facility (excluding the possibility of taking an FDA-approved, at-home COVID-19 test).

69.    Chief Green had never promulgated this rule before he met with Mr. Walters on September 17.  Chief Green had, in fact, previously told Mr. Walters on August 17 that there was no requirement at the time for exempted fire fighters to submit to weekly testing.

70.    Mr. Walters asked Chief Green to reconsider the testing requirement, or the vaccination rule in general, but Green refused.

71.    Based on the facts, circumstances, and close timing of the matter, plaintiff alleges that the real reason Chief Green, or John Scanlon, invented this new rule was in direct response to Mr. Walters's request for religious exemption.  Specifically, the rule was meant to be a "poison pill" designed to force Mr. Walters to withdraw his request for religious-based exemption, or resign, or face termination, because Mr. Walters could not financially afford to obtain weekly COVID-19 tests at a medical facility.

72.    In other words, Chief Green, or John Scanlon, did not believe that weekly COVID testing at a medical facility was reasonable, necessary, or even worthwhile. Green had never promulgated such a testing rule before Mr. Walters submitted his request for exemption.  Green had permitted his entire firefighting department to go without any COVID testing or vaccination at all for nearly 18 months of the

pandemic, and only changed course after Mr. Walters's requested an exemption based on his religious objection, which Green then denied because he regarded those beliefs as "fringe" and unworthy of protection.

73.     Based on the facts and circumstances of the matter, Chief Green, or John Scanlon, knew that weekly medical-facility testing was prohibitively expensive based on Mr. Walters's fire fighter pay.   Green or Scanlon intended to impose this extraordinary expense on Mr. Walters so he would withdraw his request for exemption, resign, or face termination.

74.     Likewise, Chief Green provided no cogent or rational explanation for why he required Mr. Walters to submit to weekly COVID-19 testing at a medical facility, at his own expense, rather than by using an FDA approved at-home COVID-19 test that was far more affordable and widely available at the time.

75.     Specifically, more than one year earlier, the U.S. Food and Drug Administration had already awarded Emergency Use Authorization to Abbott Laboratories' at-home "BinaxNOW Covid-19 Test Kit."[4]   More than six months earlier, in February 2021, the U.S. government signed a $231.8 million dollar contract with the pharmaceutical company Ellume, Ltd. for up to 100,000 at-home COVID-19 tests each month from February through July.[5]   These and many other at-home COVID-19 tests were available, approved, far more affordable, and would have provided the same information to the Byram fire department regarding whether Mr.

---

[4] *See, e.g.*, "COVID-19 Timeline" at https://www.cdc.gov/museum/timeline/covid19.html
[5] *Id.*

Walters currently carried the SARS-CoV-2 virus or not.

76.    Nor did Chief Green offer any cogent or rational explanation for why he required Mr. Walters to submit to weekly COVID-19 tests but did not require testing for any other Byram fire fighter who had received a prior COVID-19 vaccination. Nearly two months earlier, the CDC had reported that the so-called Delta variant had become the dominate COVID-19 variant in the United States, and, as of July 30, 2021, "The early data showing high viral loads in people infected with the Delta variant of COVID-19 suggest a concern that, unlike with other variants, vaccinated people infected with Delta can transmit the virus to others."[6]  In other words, at the time, it was widely reported by the U.S. government that COVID-19 vaccination did not necessarily prevent breakthrough infections or transmission of the virus.  For instance, shortly before Mr. Walters was eventually terminated on November 3, 2021, the *Lancet* medical journal reported on October 29, 2021 that "fully vaccinated individuals with breakthrough infections have peak viral load similar to unvaccinated cases and can efficiently transmit infection in household settings, including to fully vaccinated contacts."[7]

77.    Based on these facts and circumstances, and the close timing of the events in question, the only reasonable and objective conclusion is that Chief Green, or John Scanlon, invented the weekly testing rule to force Mr. Walters to either withdraw his request for religious-based objection, resign, or face termination because of his

---

[6] *Id.* at https://www.cdc.gov/museum/timeline/covid19.html
[7] *See* Note 3, *supra.*

religious beliefs.

78.    Further, based upon these same facts and circumstances, Green's weekly-testing requirement did not offer any reasonable accommodation at all.  It was merely a pretextual sham to discriminate against Mr. Walters based on his religious beliefs and force his compliance, resignation, or termination.

79.    Shortly thereafter, Mr. Walters submitted to Chief Green a six-page, personal essay further describing in detail in his religious objection to Green's vaccination rule. Mr. Walters further described his belief that the human body is sacred, and should not be harmed, and that compelled vaccination or other medical treatment was spiritually evil.  Mr. Walters wrote "How can I obey God's commands if I drink, smoke, use drugs, or take the vaccine?  I cannot."  Mr. Walters also described his belief that, because the currently available COVID-19 vaccines were researched, tested, or based upon aborted fetal stem cells, the use of those vaccine products were also religiously "unclean" and likewise prohibited.  Mr. Walters concluded his essay by again asking to be exempted from Chief Green's vaccination rule based upon his religious objection.

## G.    Mayor White Denies Mr. Walters any Reasonable Accommodation

80.    On September 21, 2021, Chief Green and John Scanlon wrote a formal response to Mr. Walter's request for religious exemption.

81.    Green and Scanlon's letter indicated that the City of Byram had not yet decided whether to accept the sincerity of Mr. Walters's religious objection.  Green and Scanlon's letter re-iterated that the only accommodation Byram offered was for Mr. Walters to submit to weekly COVID-19 testing, at a medical facility, at his own

expense.

82.    The Byram fire department provides each employee with an informal grievance procedure.

83.    Step 1 of the procedure permits the fire fighter to bring his concern to the Fire Chief.  Step 2 permits the fire fighter to bring his concern to the Mayor.  Step 3 permits the fire fighter to bring his concern to the Board of Alderman.

84.    Under Step 3, relevant to this case, and to the best of plaintiff's understanding, the Board of Alderman vote via resolution or other official act to terminate or not terminate the fire fighter.

85.    To the best of plaintiff's understanding, under Byram's code-charter form of government, the Mayor then approves or vetoes the Board's action.

86.    On September 23, 2021, Mr. Walters timely requested to proceed to Step 2 of the grievance process.

87.    One week later, on September 30, 2021, the Board of Alderman voted by ordinance or rule to approve Chief Green's proposed vaccination rule.  Mayor White then presumably approved the ordinance or rule.

88.    On October 5, 2021, Mr. Walters met with Mayor White.  John Scanlon was also at the meeting, along with a Byram human resources officer, and others in support of Mr. Walters.

89.    Mr. Walters reiterated the nature of his religious objection.  Mr. Walters reiterated that he had contacted a local medical facility and, based on the prevailing prices at the time, would be required to spend approximately $12,000 per year in

weekly testing costs. Mr. Walters reiterated that based on his current, gross salary of $32,000, weekly testing costs would equal approximately one-third of his gross salary, and one-half of his after-tax salary. Mr. Walters reiterated that this was impossible on its face – he could not afford to undertake the testing even if he wanted to – and so the requirement provided no actual accommodation at all because it was impossible for Mr. Walters to comply with.

90.    Mayor White asked Mr. Walters what accommodation he proposed. Mr. Walters indicated he would fully comply with Chief Green's prior policy of always wearing a face covering and performing temperature self-checks on a daily basis, which was the same rule that had been in effect for approximately the beginning of the pandemic for the past 18 months.

91.    If offered, Mr. Walters would have also agreed to submit to weekly at-home COVID-19 testing based on its far more affordable pricing.

92.    Mayor White concluded the meeting with no immediate resolution.

93.    On October 20, 2021, Mayor White signed a formal letter addressed to Mr. Walters indicating that Mr. Walters must either receive a COVID-19 vaccination by November 3, 2021; or begin weekly testing at a medical facility at his own expense; or be terminated.

94.    Mayor White did not indicate any reason (rational or otherwise) why Chief Green had promulgated the vaccination rule now as opposed to at any other time; why at-home testing was not sufficient rather than medical-facility testing; or why no other fire fighter was required to submit to weekly testing despite the prevailing

public health consensus at the time that even vaccinated people could develop breakthrough COVID-19 infections and transmit the virus. And while Mayor White indicated that a vaccination rule was necessary for the fire department – but not any other Byram city department, including the policy department – Mayor White did not indicate why the rule was required in October 2021 as opposed to at any point in the prior 18 months of the pandemic.

95.    Finally, Mayor White's October 20 letter suggested four local testing facilities that, so the letter said, offered free COVID-19 testing. Mr. Walters contacted each of the four suggestions. Two of the locations did not perform COVID-19 testing at all. The other two did not provide free testing. Based upon the facts and circumstances of the matter, Mayor White, or John Scanlon, or whomever wrote the letter knew these locations did not offer free testing, but merely suggested them in an attempt to bolster the pretextual sham that City of Byram was offering Mr. Walters a workable, reasonable accommodation, when in reality the scheme was designed to discriminate against Mr. Walters because of his religion by forcing him to withdraw his religious objection, or resign, or be terminated.

**H.    The Board of Alderman Vote to Terminate Mr. Walters's Employment**

96.    Mr. Walters timely initiated Step 3 of the grievance process.

97.    Mr. Walters addressed the Board during its October 28, 2021 meeting.

98.    Mr. Walters once again reiterated the nature of his religious objection. He reiterated that Chief Green recruited him based on his assertion at the time that Mr. Walters would not be required to undergo weekly COVID-19 testing. Mr. Walters

again reiterated that Chief Green at first rejected his request for exemption because Green did not reckon Mr. Walters's religious beliefs, as an adherent to the Pentecostal faith, were worthy of protection. Mr. Walters again reiterated the impossible financial cost of paying for weekly COVID-19 testing at his own expense.

99. The Board of Alderman asked no questions during the hearing.

100. The Board of Alderman then privately met in an executive session.

101. During that session, the Board voted to terminate Mr. Walters.

102. To the best of plaintiff's understanding, under the City of Byram code-charter, Mayor White would have then been required to approve the resolution or ordinance of termination.

103. The Board later released its formal findings of fact. The findings of fact were substantively the same as the discussion presented by Chief Green and John Scanlon in their letter to Mr. Walters dated September 21, and Mayor White's letter dated October 20. The Board concluded without any rational basis that the vaccination rule it approved for the fire department provided Mr. Walters with a reasonable accommodation, and Mr. Walters should be terminated because of his refusal to receive a COVID-19 vaccination or submit to weekly testing at a medical facility at his own expense. Mr. Walters did not learn of the Board's vote until November 3, 2021.

104. On November 3, 2021, Mayor White and a City of Byram human resources officer named Ledireada Kent informed Mr. Walters he was terminated effective that day pursuant to the Board's vote.

I.     **The Aftermath**

105.    Mr. Walters suffered unemployment, loss of his income, loss of his fringe benefits, and loss of his future Public Employees' Retirement System of Mississippi (PERS) pension value because of City of Byram's religious discrimination, failure to accommodate, and wrongful termination.

106.    Mr. Walters suffered significant mental anguish and emotional distress because of Byram's religious discrimination, failure to accommodate, and wrongful termination.

107.    Mr. Walters suffered other compensatory and out-of-pocket damages because of City of Byram's religious discrimination, failure to accommodate, and wrongful termination.

## CAUSES OF ACTION

A.    **Wrongful    Termination    and    Unlawful    Disparate-Impact Discrimination Based on Religion against City of Byram under Title VII**

108.    Mr. Walters states a cause of action for wrongful termination and unlawful disparate-impact discrimination because of his religion against City of Byram under Title VII.

109.    Pursuant to Title VII of the Civil Rights Act of 1964 (as amended), an employer may not discriminate against any "individual with respect to . . . terms, conditions, or privileges of employment, because of such individual's . . . religion[.]"  42 U.S.C. §2000e-2(a)(1).  An employer discriminates because of an employee's religion when the employer uses "a particular employment practice that causes a disparate impact

on the basis of . . . religion" unless the employer proves "the challenged practice is job related for the position in question and consistent with business necessity[.]"

110.    Proof of discrimination intent is not required in a disparate-impact case. *Munoz v. Orr*, 200 F.3d 291, 299-300 (5th Cir. 2000).  Instead, a plaintiff prevails by proving "facially neutral employment practices . . . create[d] such statistical disparities disadvantaging members of a protected group that they [were] 'functionally equivalent to intentional discrimination.'" *Id*.

111.    An employer who discriminates against an employee in violation of Title VII is liable for the employee's lost back wages, lost future wages or reinstatement, compensatory damages, punitive damages, and reasonable attorney's fees and costs incurred in the matter.

112.    Plaintiff incorporates by reference here all the factual allegations alleged in this lawsuit.

113.    City of Byram enacted a COVID-19 vaccination policy for its fire fighters, and only its fire fighters.  The policy exempted fire fighters who held religious objection to the policy, but only if they agreed to undertake weekly COVID-19 testing at a medical facility at their own expense.  This had never been the rule at any point prior in the pandemic, and Byram's decision-makers never explained any reason (rational or otherwise) why they required COVID-19 vaccination at all, or why their policy required weekly testing as of September 30, 2021 in lieu of vaccination based on religious objection.  Further, by that time, the U.S. Centers for Disease Control, as well as other public health authorities, explained that the then-available COVID-19

20

vaccines did not necessarily prevent breakthrough infections among vaccinated people or transmission of the predominate COVID-19 variant at the time – the so-called Delta variant. Byram's decision-makers never explained any reason (rational or otherwise) why all fire fighters were not required to submit to weekly tests for COVID-19 at a medical facility at their own expense, only religious objectors.

114.    On its face, and as applied, the fire department's weekly-test requirement was a material and financial burden on religious objectors who were, from a public health perspective, either similarly situated to their vaccinated firefighting colleagues, or for whom there was no rational basis to require weekly COVID-19 testing in the first place.

115.    Ultimately, both on its face and as applied, the fire department's weekly test requirement at a medical facility at a fire fighter's own expense had the effect of disparately impacting only fire fighters who held religious objection to Green's vaccination rule. The rule therefore disparately impacted fire fighters based on their religious beliefs.

116.    Accordingly, City of Byram owes Mr. Walters all damages arising from its disparately impacting policy, including Mr. Walters lost back wages, lost future wages or reinstatement, compensatory damages, and reasonable attorney's fees and costs incurred in the matter.

**B.    Wrongful Termination and Unlawful Disparate-Treatment Discrimination Based on Religion against City of Byram under Title VII**

117.    Mr. Walters states a cause of action for wrongful termination and unlawful

disparate-treatment discrimination based on his religion against City of Byram under Title VII.

118.    Under Title VII, an employer illegally discriminates against and terminates an employee when the decision is "because of" the worker's religion.  42 U.S.C. §2000e-2(a)(1).  An employer also illegally terminates an employee when the decision "was a motivating factor for any employment practice, even though other factors also motivated the practice."  42 U.S.C. § 2000e-2(m); *accord Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 333 (5th Cir. 2005) (so holding). In a Title VII disparate-treatment action, an employer is vicariously liable for its decision-maker's discriminatory acts when the decision-maker serves as the employer's agent, or when the employer knew or should have known of the decision-maker's discriminatory conduct and took no remedial action.  *See e.g.*, *Flanagan v. Aaron E. Henry Cmty. Health Servs. Ctr.*, 876 F.2d 1231, 1235 (5th Cir. 1989).

119.    Plaintiff incorporates by reference here all the factual allegations alleged in this lawsuit.

120.    Fire Chief Fred Green recruited Robert Walters to come work for the Byram Fire Department.  Before accepting the job, Mr. Walters told Chief Green he held a religious objection to receiving any of the then-available COVID-19 vaccinations. Chief Green indicated he would exempt Mr. Walters from the requirement.  Mr. Walters asked if he would be required to undergo weekly testing.  Chief Green indicated there was no such requirement as of August 17, 2021.  Mr. Walters accepted the job offer, quit his current and higher paying firefighting job, and came to work for

Byram.

121.   Mr. Walters formally submitted his request for exemption based on religious objection.  Chief Green told Mr. Walters he had spoken to Byram's city attorney, John Scanlon, and Scanlon indicated Mr. Walters's religious objection was not "sufficient" for protection.   Green told Mr. Walters that the Pentecostal church did not find vaccination objectionable, but Green would have approved the request for exemption if Mr. Walters was, for instance, a Jehovah's Witness.  Based on his tone, demeanor, and the context of the conversation, it was objectively obvious that Green, or Scanlon, or both, disdained Mr. Walters because he regarded Mr. Walters's beliefs as "fringe" and unworthy of protection.  Green ended the meeting by telling Mr. Walters to get vaccinated or get fired.

122.   At that time, Green had not announced any intention to require religious objectors who obtained an exemption to submit to weekly COVID-19 testing at a medical facility at their own expense.

123.   When Mr. Walters continued to press his religious objection, Green again met with Mr. Walters on September 17, 2021.  There, Green for the first time told Walters that he would be exempted from the COVID-19 vaccination rule, but only if he submitted to weekly COVID-19 testing at a medical facility at his own expense. Green did not indicate why he had decided on this rule.   Given the facts, circumstances, and extraordinarily close timing of the events, the only objective and rational conclusion is that Green specifically implemented the weekly test requirement to be a "poison pill" for Mr. Walters designed to force Mr. Walters to

withdraw his religious objection, resign, or be terminated.  In other words, Green knew that weekly testing at a medical facility at Mr. Walters's own expense would be prohibitively expensive, and that Mr. Walters had already expressed concern about that specific requirement.  Green implemented the weekly testing rule as a specific, known pressure point against Mr. Walters, and Green, or Scanlon, or both, did this because they disdained Mr. Walters because of his religion.

124.   Mr. Walters grieved Green's decision to both Mayor White and the Board of Alderman.  It appears that John Scanlon advised Green, the Mayor, and likely the Board of Alderman in regards to Mr. Walters's request for exemption.  Each entity refused to deviate from Green's rule (later enacted by the Board of Alderman pursuant to ordinance or resolution on September 30, 2021).  Based on the facts and circumstances of the case, Green, or Scanlon, or both, used the Mayor and the Board of Alderman as their cat's paw to discriminate against Mr. Walters because of his religion, and to ultimately force his termination.

125.   Alternatively, based on the same facts and circumstances described throughout this lawsuit, the Mayor and Board of Alderman were also biased against Mr. Walters because of his religion and used Green's vaccination rule to force Mr. Walters's termination.

126.   Ultimately, the Board of Alderman and Mayor White terminated Mr. Walters on November 3, 2021.  Plaintiff alleges that had he been a different religion approved of and not disdained by Green, Scanlon, the Mayor, or the Board of Alderman (such as, for instance, Jehovah's Witnesses), then these decision-makers would not have

imposed a weekly testing requirement on Mr. Walters and would not have terminated his employment.

127.    Likewise, plaintiff alleges that had he had a secular reason for refusing vaccination (such as a medical disability), then these decision-makers would not have imposed a weekly testing requirement on Mr. Walters and would not have terminated his employment.

128.    Accordingly, City of Byram owes Mr. Walters all damages arising from their disparate-treatment discrimination, including Mr. Walters lost back wages, lost future wages or reinstatement, compensatory damages, and reasonable attorney's fees and costs incurred in the matter.

## C.    Wrongful Termination and Failure to Reasonably Accommodate Religious Objection against City of Byram under Title VII

129.    Mr. Walters states a cause of action for wrongful termination and failure to reasonably accommodate his religious objection against City of Byram under Title VII.[8]

130.    Title VII makes it "an unlawful employment practice . . . for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977). A plaintiff proves a prima facie case for failure-to-accommodate discrimination by showing "(1) that he had a bona fide religious belief

---

[8] The Supreme Court has held a failure-to-accommodate-religious-objection claim under Title VII is properly classified as a claim for disparate-treatment discrimination under 42 U.S.C. § 2000e-2. *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 772 (2015). Here, plaintiff presents the facts and law of his failure-to-accommodate claim separately from his earlier disparate-treatment cause of action for sake of clarity.

that conflicted with an employment requirement; (2) that he informed the employer of his belief; and (3) that he was discharged for failing to comply with the conflicting employment requirement." *Antoine v. First Student, Inc.*, 713 F.3d 824, 831 (5th Cir. 2013). Once the plaintiff proves a prima facie case, "the burden shifts to the defendant to demonstrate either that it reasonably accommodated the employee, or that it was unable to reasonably accommodate the employee's needs without undue hardship." *Id.* Current decisional law holds a proposed accommodation is unreasonable "when an employer is required to bear more than a de minimis cost." *Davis v. Fort Bend Cty.*, 765 F.3d 480, 487 (5th Cir. 2014); *accord Hardison*, 432 U.S. at 84.

131.   Plaintiff incorporates by reference here all the factual allegations alleged in this lawsuit.

132.   At the outset, Mr. Walters has proven his prima facie case for failure-to-accommodate discrimination. He holds a religious belief that conflicted with City of Byram's COVID-19 vaccination policy (described throughout this lawsuit). Mr. Walters timely requested a reasonable accommodation based on his religious objection. Byram admittedly fired Mr. Walters because he failed to comply with its vaccination policy. Byram in turn, failed to reasonably accommodate Mr. Walters's religious beliefs. The only "accommodation" offered was for Mr. Walters to submit to weekly COVID-19 testing at a medical facility at his own expense. Mr. Walters explained he could not afford to comply with the accommodation even if he wanted to, which would cost him approximately $12,000 per year – or about one-half of his

after-tax wages – and so the "accommodation" was merely a different way of forcing Mr. Walters to withdraw his religious objection, resign, or be terminated. Although Mayor White suggested four locations that offered "free" COVID-19 testing, none of them actual did so. Based upon the facts and circumstances of the case, plaintiff alleges Mayor White already knew this at the time.

133. For purposes here, Mr. Walters alleges that multiple reasonable accommodations existed that would have permitted him to continue working while observing his religious beliefs. First, Mr. Walters offered to observe the same safety precautions that Chief Green had already imposed on all Byram fire fighters for the past 18 months of the pandemic, including the use of approved face covering and performing daily self-checks for temperature. Chief Green must have believed that these precautions were safe and effective enough both for his employees and the Byram community, because Green never required vaccination until September 2021, and never required weekly testing as a condition of exemption until Mr. Walters submitted his request for religious-based exemption. Mr. Walters specifically alleges that, based on these facts and circumstances, he was not a direct threat to himself or others at all. And this reasonable accommodation would have cost City of Byram nothing in terms of financial cost, administrative burden, or risk to employee or public safety (compared to the historical or current risks posed at the Byram fire department).

134. Second, City of Byram could have permitted Mr. Walters to submit to weekly COVID-19 testing via any of the then-FDA approved, at-home COVID-19 tests which

were widely available, reliable, accurate, safe, and inexpensive. If offered this accommodation, Mr. Walters would have accepted. No Byram decision maker ever articulated a reason (cogent, rational, or otherwise) for why Mr. Walters was required to spend nearly half of his after-tax wages on medical facility testing when at-home testing had already been approved by the FDA under its emergency use authorization. This is especially true given that, before Mr. Walters submitted his request for accommodation, Chief Green had not ever formulated any rule that required any fire fighter to submit to any weekly testing for any reason for the past 18 months of the pandemic. This reasonable accommodation would have cost City of Byram nothing in terms of financial cost, administrative burden, or risk to employee or public safety.

135. Alternatively, Mr. Walters alleges that City of Byram could have reasonably accommodated him in some other way, and it remains Byram's burden of persuasion, akin to an affirmative defense, to prove otherwise during the case.

136. Accordingly, City of Byram owes Mr. Walters all damages arising from its failure to reasonably accommodate his religious beliefs and practices, including Mr. Walters lost back wages, lost future wages or reinstatement, compensatory damages, and reasonable attorney's fees and costs incurred in the matter.

137. Finally, in the alternative, if the Court were to find that a proposed accommodation would have permitted Mr. Walters to continue working at City of Byram was nevertheless "unreasonable" because it imposed something more than "de minimis" burden on Byram, Mr. Walters alleges the proper standard to evaluate a

reasonable accommodation claim in a Title VII religious objection case is akin to the standard currently applicable in disability claims under the ADAAA – that is to say, an individualized assessment of current circumstances that show that a specific reasonable accommodation would cause the employer significant difficulty or expense. *See* 29 C.F.R. § 1630.2. Plaintiff alleges the "de minimus" standard currently applicable to Title VII religious objection cases is inconsistent with the statutory text of 42 U.S.C. § 2000e(j) and its meaning and should be overturned. Plaintiff likewise alternatively alleges that City of Byram was obligated to extend to Mr. Walters any reasonable accommodation from its COVID-19 vaccination policy on account of his religious objection that it afforded to any other employee for any other reason. *See E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 775 (2015) ("But Title VII does not demand mere neutrality with regard to religious practices – that they be treated no worse than other practices. Rather, it gives them favored treatment . . . Title VII requires otherwise-neutral policies to give way to the need for an accommodation").

**D.    Wrongful Termination, Unlawful Disparate-Treatment Discrimination Based on Religion, and Failure to Accommodate Religious Objection against City of Byram under the Mississippi Religious Freedom Restoration Act**

138. Mr. Walters states a cause of action for wrongful termination, disparate-treatment discrimination because of his religion, and failure to reasonably accommodate his religious beliefs against City of Byram under the Mississippi Religious Freedom Restoration Act codified at Miss. Code Ann. § 11-61-1 ("MSRFRA").

139.    Under the MSRFRA, "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless the government "demonstrates that application of the burden to the person [i]s in furtherance of a compelling governmental interest; and [i]s the least restrictive means of furthering that compelling governmental interest."  Miss. Code Ann. § 11-61-1(5) *et seq.*

140.    "Government" under the MSRFRA includes any "political subdivision" of Mississippi.  Miss. Code Ann. § 11-61-1(4)(a).  City of Byram, because it is a municipality, is a "political subdivision" under Mississippi state law.  Miss. Code Ann. § 11-46-1(i) ("'Political subdivision' means any . . . municipality").

141.    Under the MSRFRA, "[a] person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against the government . . . ."  Miss. Code Ann. § 11-61-1(6).

142.    The MSRFRA applies to all "state laws, rules . . . and any municipal or county ordinances, rules or regulations and the implementation of those laws, whether statutory or otherwise . . . ."  Miss. Code Ann. § 11-61-1(7)(a).

143.    Explicit in its broad scope, and implicit in its narrow exceptions, the MSRFRA provides a cause of action for wrongful termination because of religion by a governmental employee against his governmental employer.  Miss. Code Ann. § 11-61-91(10) (providing that "Nothing in this section shall create any rights by an employee against an employer if the employer is ***not*** the government") (emphasis

added).[9]

144.    The MSRFRA does not provide a statute of limitations for a person's cause of action against the government for religious discrimination.    Accordingly, Mississippi's three-year "general" or "residual" statute of limitations applies.  Miss. Code Ann. § 15-1-49 (providing that "All actions for which no other period of limitation is prescribed shall be commenced within three (3) years next after the cause of action accrued, and not after").

145.    The plain text of the Mississippi Tort Claims Act ("MTCA") does not apply to a person's cause of action against the government for religious discrimination under the MSRFRA.  *See* Miss. Code Ann. § 11-46-11 (Under the MTCA, "The limitations period provided in this section controls and shall be exclusive ***in all actions subject to and brought under the provisions of this chapter*** . . .") (emphasis added).  The MSRFRA is not codified in the same chapter as the MTCA.  The MTCA is codified in Chapter 46 of Title 11 of the Mississippi code.  The MSRFRA is codified in Chapter 61 of Title 11 of the code.    Instead, the Mississippi legislature separately and independently of the MTCA waived its sovereign immunity with respect to causes of action under the MSRFRA.  *See* Miss. Code Ann. § 11-61-1 ("A person whose religious exercise has been burdened in violation of ***this section*** may assert that violation as a claim or defense ***in a judicial proceeding*** and obtain appropriate relief against the government . . .") (emphasis added).

---

[9] To the best of his review, plaintiff cannot find any decisional law from a Mississippi state appellate court or federal court interpreting the MSRFRA in an employment discrimination case.  Therefore, this particular cause of action in this case may be *res nova*.

146.    Plaintiff incorporates by reference here all the factual allegations alleged in this lawsuit.

147.    Under Title VII, to avoid liability for Mr. Walters's wrongful termination, City of Byram must already prove that no reasonable accommodation existed that would have permitted Mr. Walters to continue working while observing his religious beliefs. Plaintiff has previously alleged that City of Byram's requirement that he submit to weekly testing at a medical facility at his own expense was unreasonable, arbitrary, and capricious on its face.  Plaintiff previously alleged that, at the very least, he should have been permitted to utilize an at-home COVID-19 test in lieu of testing at a medical facility.  Plaintiff previously alleged that he likewise should have been permitted to avoid weekly testing all together and instead observe Chief Green's prior workplace precautions of wearing a face covering and performing daily self-temperature checks.

148.    And while plaintiff should prevail on these merits regardless, City of Byram bears the additional burden of persuasion under the MSRFRA to prove by a preponderance of the evidence that its requirement that Mr. Walters submit to *any* requirement as a condition of being exempted from Chief Green's COVID-19 vaccination rule based on religious objection was "in furtherance of a compelling governmental interest" and was "the least restrictive means of furthering that compelling governmental interest."

149.    For the reasons alleged throughout this complaint, City of Byram cannot bear this burden as a matter of law.  No compelling reason required Mr. Walters to submit

to weekly COVID-19 testing at a medical facility at his own expense when at-home COVID-19 tests were already FDA-approved via emergency use authorization, readily available, far more affordable, effective and reliable, and did not constitute an impossible financial burden on Mr. Walters.  Further, given that both vaccinated and unvaccinated people were capable of contracting and spreading the so-called Delta variant of the SARS-CoV-2 virus, and given that City of Byram did not require its vaccinated fire fighters to submit to any weekly testing at all, plaintiff alleges that any testing requirement was arbitrary, capricious, not in furtherance of any compelling governmental interest, and not the least restrictive means of accomplishing any public or employment-related safety goal.  Mr. Walters specifically alleges that, based on these facts and circumstances, he was not a direct threat to himself or others at all.  In any event, it remains City of Byram's burden of persuasion to prove otherwise.

150.    Accordingly, City of Byram owes Mr. Walters all damages arising from its disparate-treatment discrimination based on religion and failure to reasonably accommodate his religious beliefs and practices, including Mr. Walters lost back wages, lost future wages or reinstatement, and compensatory damages.

## JURY DEMAND

Mr. Walters requests a trial by jury on all issues and causes of action triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff Robert Walters prays that this complaint be deemed good and sufficient; that it and summons be served upon defendant City of Byram; and, after due proceedings are had, that judgment be entered in favor of plaintiff and against defendant:

1.  Under Title VII and the MSRFRA, the entry of a declaratory judgment in favor of Mr. Walters and against City of Byram declaring that the practices complained of in this complaint are unlawful under federal and state law and that City of Byram willfully, maliciously, or recklessly as the case may be violated the rights of Mr. Walters as alleged and proven.

2.  Under Title VII, awarding Mr. Walters all damages and equitable relief due against City of Byram, including but not limited to back pay, front pay or reinstatement, compensatory damages, and reasonable attorney's fees and costs.

3.  Under the MSRFRA, awarding Mr. Walters all damages and equitable relief due against City of Byram, including but not limited to back pay, front pay or reinstatement, and compensatory damages.

4.  Under Title VII and the MSRFRA, awarding all other legal or equitable relief to which plaintiff is due, including but not limited to an injunction against City of Byram forbidding them from requiring employees who are exempted from the Byram Fire Department's COVID-19 vaccination rule from to submit to weekly COVID-19 testing at a medical facility at their own expense.

Respectfully submitted:

/s/ *Matthew L. Devereaux*

Matthew L. Devereaux (#101833)
The Devereaux Law Firm
2113 Lakeshore Drive
Mandeville, LA 70448
t: (985) 705-6288
f: (985) 238-3535
matt@devereauxlawfirm.com

*Attorney for plaintiff Robert Walters*

**Clerk of Court: please hold summons pending attempt to secure waiver of service**